IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
AXALTA COATING SYSTEMS, LLC,   :
      Plaintiff,   :
        :
    v.   :   CIVIL ACTION NO. 15-5243
        :
MIDWEST II, INC.,   :
      Defendant.   :
_____:

**MEMORANDUM OPINION**

**RUFE, J.**                                                                                               **NOVEMBER 8, 2016**

Before the Court is the Motion to Dismiss Amended Counterclaims and Strike Affirmative Defense of Plaintiff Axalta Coating Systems, LLC (Doc. No. 22). For the reasons that follow, the motion is granted in part and denied in part.

## I. BACKGROUND

### A. The Agreement

This contractual dispute stems from a promising business relationship that quickly deteriorated. Plaintiff is a corporation with its principal place of business in Pennsylvania that manufactures and sells "e-coat" automotive paint products, which are deposited on automotive parts using an electrical current.[1] Defendant Midwest II, Inc. is a buyer of e-coat products, which it uses to provide painting services for the automotive parts of its customers.[2] Compared to Plaintiff, Defendant is a relatively small business, and is privately owned by Mr. Olin White, with its only place of business in Ottawa Lake, Michigan.[3]

---

[1] Doc. No. 1 (Complaint) ¶ 1; Doc. No. 20 (Amended Answer, Affirmative Defenses, and Counterclaims) ¶¶ 1, 68. As Plaintiff seeks to dismiss Defendant's counterclaims, where the parties disagree concerning the facts, the Court assumes the facts to be as alleged by Defendant.

[2] *Id.* ¶ 69.

[3] *Id.* ¶¶ 68-69.

Throughout late 2014 and early 2015, Plaintiff and Defendant explored an agreement under which Plaintiff would become Defendant's exclusive supplier of e-coat products.[4] During their negotiations, Defendant sought assurances that Plaintiff's products would work in Defendant's facilities and meet certain quality standards.[5] These assurances were important to Defendant, as the automotive industry generally follows a "just-in-time" supply chain, and Defendant was expected to provide parts to its customers on a short time frame.[6] As part of the negotiating process, Plaintiff audited Defendant's facilities and e-coat capabilities.[7] Plaintiff also presented Defendant with documentation from a "Pour Over Study," which showed that Plaintiff's paint was superior to that of its competitors and could be mixed with the paint Defendant currently used in its tanks, meaning that Defendant could immediately transition to using Plaintiff's products.[8]

The parties ultimately memorialized their relationship in an agreement, which was signed and dated February 16, 2015.[9] The parties disagree regarding when and how the agreement was executed, but the following material terms are not in dispute. Defendant promised that it would purchase 100% of its e-coat products from Plaintiff for five years,[10] aside from certain exceptions not relevant here, and that such purchases would equal or exceed $7,400,000.[11] A breach of this exclusivity provision allowed Plaintiff to terminate the agreement

---

[4] *Id.* ¶ 71.

[5] *Id.* ¶¶ 72-76.

[6] *Id.* ¶ 70.

[7] *Id.* ¶ 73.

[8] *Id.* ¶¶ 74-76.

[9] Doc. No. 1 ¶¶ 13-14; Doc. No. 20 ¶ 2.

[10] Doc. No. 1, Ex. 1-A (Agreement Exhibit A) § 2.1.

[11] *Id.* § 2.1.

"immediately."[12]  In exchange, Defendant received an $800,000 "prebate" to be used to enhance its business.[13]  Plaintiff could then recoup a prorated amount of this $800,000 payment in the event that Defendant breached the contract or Plaintiff terminated the agreement.[14]

The agreement also contained a boldface disclaimer of warranties, which provided that aside from certain warranties regarding the title of its products, Plaintiff:

> "**makes no other representation or warranty to [Defendant] of any kind, express or implied, whether created by contract or by operation of law, including any warranties concerning the use, compatibility or performance of the Products, any warranties of merchantability, [or] fitness of the Products for any particular purpose** . . . ."[15]

Defendant alleges that this language does not reflect the parties' actual agreement. Instead, Defendant claims that during the final negotiations in February 2015, Defendant insisted that Exhibit A to the agreement (which contains product and pricing information) be modified to include an express warranty that Plaintiff's products "meet or exceed published quality standards."[16]  According to Defendant, Mr. White (the owner) told Plaintiff's representatives at a February 16, 2015 meeting that the agreement was a "no go" unless this warranty was included.[17]  At the same meeting, Defendant presented Plaintiff with four execution copies of the agreement, along with separate "redlines" of a prior draft showing the addition of the warranty language, among other changes, and Mr. White signed the execution copies on behalf of Defendant, after which they were placed in a protective document sleeve.[18]

---

[12] *Id.* § 12.1.

[13] *See Id.*, Ex. 1-B (Agreement Exhibit B) § 1.

[14] Doc. No. 1 ¶ 18.

[15] *Id.*, Ex. 1, § 9 (bold in original).

[16] Doc. No. 20 ¶ 107.

[17] *Id.* ¶ 109.

[18] *Id.* ¶¶ 110-12.

Defendant alleges that, after this, Plaintiff committed fraud to ensure that Defendant signed its preferred version of the agreement, which did not include any warranties regarding product quality. According to Defendant, Plaintiff's representatives at the February 16 meeting (Don Witt and Nick Francisco) stated that they did not have the authority to sign the agreement on behalf of Plaintiff, and that it had to be taken back and signed by "corporate," and they left with the four partially executed documents.[19] Plaintiff's representatives then returned two days later, and presented Mr. White with four copies of the agreement, contained in the same document sleeve as the previous meeting, which Mr. Witt, Plaintiff's representative, asked Mr. White to sign again.[20] Mr. White obliged him, and also back-dated the agreements to February 16, 2015, at Mr. Witt's request.[21] Mr. Witt then signed the agreements as well, although he signed in the name of "Michael Cash," whom Mr. White had never met.[22]

Defendant later learned that these fully executed agreements did not contain the express warranty that Mr. White had insisted upon, and that had been added to Exhibit A of the versions of the agreement that Mr. White signed on February 16.[23] That is, Defendant claims that it was misled into signing an agreement without any express warranties regarding product quality.

### B. The Dispute

After the execution of the agreement, Defendant began using Plaintiff's products in April 2015, but encountered serious problems within the first week.[24] Plaintiff's paint failed to coat properly the parts Defendant attempted to use it on, leading to customer dissatisfaction and a

---

[19] *Id.* ¶ 113.

[20] *Id.* ¶¶ 115-17.

[21] *Id.* ¶¶ 119-20.

[22] *Id.* ¶ 121.

[23] *Id.* ¶ 122.

[24] *Id.* ¶ 79.

4

"daily reject rate" that sometimes exceeded 8%, which Defendant claims was unsustainable and caused crippling economic damage to its business.[25] To cope with these problems, Defendant had to devote inordinate time and money to sorting, shipping, and stripping rejected parts, which Defendant claims resulted in over $1 million in costs and lost business.[26] Defendant notified Plaintiff of these issues, and the parties attempted to work out the problems between April and September 2015.[27] However, they were ultimately unsuccessful, as it became clear that the chemistry of Plaintiff's paint rendered it incapable of performing adequately in Defendant's facilities.[28]

Eventually, Defendant decided to switch suppliers. Defendant informed Plaintiff on September 11, 2015, that it would stop using Plaintiff's products as of that date, and would instead purchase e-coat products from one of Plaintiff's competitors.[29] As of then, Plaintiff alleges that Defendant had only purchased 5.26% of the $7,400,000 in Plaintiff's products that it had promised to purchase under the agreement.[30]

Plaintiff commenced this lawsuit eight days later, alleging two counts of breach of contract, and seeking the prorated amount of its "prebate" ($757,953.29), plus damages, attorney's fees, and costs.[31] Plaintiff alleges that jurisdiction is proper under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.[32] Defendant counterclaimed for breach of contract and breach of warranty, Plaintiff

---

[25] *Id.* ¶¶ 80-81.

[26] *Id.* ¶¶ 82-88, 130.

[27] *Id.* ¶¶ 89-94.

[28] *Id.* ¶¶ 89-94.

[29] Doc. No. 1 ¶¶ 28-29.

[30] *Id.* ¶ 32.

[31] *Id.* ¶¶ 34-49.

[32] *Id.* ¶ 9.

moved to dismiss, and Defendant amended its counterclaims.[33] Defendant now brings two counterclaims: (1) breach of contract, based on Plaintiff's alleged breach of implied warranties of merchantability and fitness for a particular purpose; and (2) fraud in the execution, based on Plaintiff's alleged removal of the agreement's warranty provision before Defendant signed it on February 18, 2015.[34] Defendant moves to dismiss both claims under Federal Rule of Civil Procedure 12(b)(6), and also moves to strike Defendant's affirmative defense of fraud in the execution under Rule 12(f).

## II.　LEGAL STANDARD

Rule 12(b)(6) governs Plaintiff's motion to dismiss Defendant's counterclaims.[35] Under Rule 12(b)(6), dismissal for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" lacks enough substance to show that he is entitled to relief.[36] In determining whether a motion to dismiss should be granted, the court must consider only those facts alleged in the complaint or counterclaim, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[37] Courts are not, however, bound to accept as true legal conclusions couched as factual allegations.[38] Something more than a mere *possibility* of a claim must be alleged; a claim must allege "enough facts to state a claim to relief that is plausible on its face."[39] The claims must set forth "direct or

---

[33] Doc. No. 20.

[34] *Id.*

[35] *See, e.g.*, *PPG Indus., Inc. v. Generon IGS, Inc.,* 760 F. Supp. 2d 520, 524 (W.D. Pa. 2011) ("Courts use the same standard in ruling on a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) as they do for a complaint.") (citation omitted).

[36] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[37] *ALA, Inc. v. CCAIR, Inc*., 29 F.3d 855, 859 (3d Cir. 1994); *Fay v. Muhlenberg Coll*., No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[38] *Twombly*, 550 U.S. at 555, 564.

[39] *Id.* at 570.

inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory."[40]

Federal Rule of Civil Procedure 12(f) provides in pertinent part that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "[S]triking a pleading is a 'drastic remedy' to be used sparingly because of the difficulty of deciding a case without a factual record."[41] "Thus, although Rule 12(f) grants the court the power to grant a motion to strike, such motions 'are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'"[42]

### III. ANALYSIS

#### A. **Defendant's Breach-of-Contract Counterclaim (Count I) Is Dismissed**

Pennsylvania law governs this dispute under the plain terms of the agreement.[43] Defendant alleges in Count I that Plaintiff breached implied warranties of merchantability and fitness for a particular purpose. However, Section 9.2 of the agreement explicitly disclaims these warranties in boldface type.[44] Such conspicuous disclaimers are enforceable under Pennsylvania law.[45] Section 9.2 thus bars Defendant's counterclaim for breach of implied warranties.

---

[40] *Id.* at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)) (internal quotation marks omitted).

[41] *Dann v. Lincoln Nat'l Corp.*, 274 F.R.D. 139, 142 (E.D. Pa. 2011) (quoting *BJ Energy, LLC v. PJM Interconnection, LLC*, Nos. 08–3649, 09–2864, 2010 WL 1491900, at *1 (E.D. Pa. Apr. 13, 2010)).

[42] *Id.* at 142-43 (quoting *Wilson v. King*, No. 06–2608, 2010 WL 678102, at *2 (E.D. Pa. Feb. 24, 2010)).

[43] Doc. No. 1, Ex. 1-A, § 18(b).

[44] *Id.* § 9.2.

[45] *See* 13 Pa. Con. Stat. § 2316(b) (implied warranties can be disclaimed by conspicuous language); *Strickler v. Peterbilt Motors Co.*, No. Civ. A. 04-3628, 2005 WL 1266674, at *4-5 (explaining that "implied warranties . . . may be disclaimed by the seller so long as the disclaimer is in writing and conspicuous" and finding bold-faced disclaimer barred breach-of-warranty claim); *see also Four Seasons Tree Serv. & Landscaping, Inc. v. Terex Telelect, Inc.*, No. 3:11-CV-711, 2011 WL 2678881, at *4 (M.D. Pa. June 30, 2011) (dismissing breach-of-warranty claim in part because "[t]he sales contract waived all warranties").

Perhaps realizing the hurdle it faces, Defendant argues that the disclaimer is unconscionable.[46] "Under Pennsylvania law, a court may decline to enforce a contract clause if the court as a matter of law finds that the clause was unconscionable at the time it was made."[47] "To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable."[48] Substantive unconscionability exists where there are "contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent."[49] Procedural unconscionability exists "where there was a lack of meaningful choice in the acceptance of the challenged provision."[50]

Defendant fails to allege either substantive or procedural unconscionability. Regarding substantive unconscionability, the only term Defendant points to as unreasonable is the disclaimer of warranties, which Defendant argues is unfair in that it limits Plaintiff's liability for defects in its products. But similar provisions are routinely upheld, and Plaintiff's alleged knowledge that its products were defective is not enough to render such a straightforward limitation unconscionable.[51] Defendant thus fails to allege substantive unconscionability.

Defendant's allegations also fall short of establishing procedural unconscionability, because they do not show that Defendant lacked a meaningful choice concerning any provision of the agreement. Far from it: Defendant chose to switch from its former supplier to Plaintiff,

---

[46] Doc. No. 20 ¶¶ 100-02.

[47] *Harbison v. Louisiana-Pac. Corp.*, 602 F. App'x 884, 886 (3d Cir. 2015) (unpublished opinion) (quoting 13 Pa. Cons. Stat. § 2302(a)) (alterations and internal quotation marks omitted).

[48] *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 230 (3d Cir. 2012) (citing *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007)).

[49] *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999).

[50] *Salley*, 925 A.2d at 119.

[51] *See T.J. McDermott Transp. Co. v. Cummins, Inc.*, Civ. No. 14–04209 (WHW) (CLW), 2015 WL 1119475, at *9 (D.N.J. Mar. 11, 2015 (under New Jersey law, rejecting argument that disclaimers of warranties in purchase agreement for long-haul tractors rendered agreements unconscionable, even where plaintiff alleged that defendant knew that its tractors were defective prior to sale).

conducted at least limited due diligence, and then carefully negotiated a detailed agreement at arm's-length (and with counsel's assistance) over a period of several months.[52] Even taking Defendant's allegations as true, then, Defendant plainly did not lack a "meaningful choice."[53] And while Defendant asserts that there was a disparity of bargaining power between the parties due to their relative difference in size, "it is settled law that mere unequal bargaining power between the parties to a contract does not render the contract, or a provision thereof, unconscionable."[54] Accordingly, Defendant has failed to allege procedural unconscionability as well.

Finally, Defendant argues that dismissal of its claim would run contrary to 13 Pa. Cons. Stat. § 2302, which provides that a party should be "afforded a reasonable opportunity to present evidence" in support of an unconscionability claim.[55] However, that provision is satisfied where, as here, a court assumes the complaining party's allegations are true for the purposes of deciding a motion to dismiss, and thus "no further evidence is needed" to resolve Defendant's counterclaim.[56]

---

[52] Doc. No. 20 ¶¶ 71-108 (describing Plaintiff's decision to switch from its former supplier to Plaintiff and negotiation process). The facts here thus differ starkly from *Al's Auto Inc. v. Hollander Inc.*, Civ. No. 08-731, 2010 WL 3855251, at *1 (E.D. Pa. Sept. 29, 2010), which Plaintiff relies upon. *See* Doc. No. 28 (Defendant's Opposition to Plaintiff's Motion to Dismiss) at 8. In *Al's Auto*, the plaintiff alleged that it had no choice but to upgrade to a newer version of the defendant's software (Powerlink 2.0), because its business was dependent on the prior version (Powerlink 1.0), which it had used for nearly twenty years and which the defendant ceased supporting once Powerlink 2.0 was released. *Al's Auto*, 2010 WL 3855251, at *6. Here, Defendant was not faced with any such forced choice.

[53] *See Country Classics at Morgan Hill Homeowners' Ass'n v. Country Classics at Morgan Hill, LLC*, 780 F. Supp. 2d 367, 374 (E.D. Pa. 2011) (dismissing claim premised on unconscionability on 12(b)(6) motion because "[e]ven accepting Plaintiff's factual averments as true, the claim is deficient because Plaintiff has not alleged . . . that they lacked a meaningful choice").

[54] *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 264 (Pa. Super. Ct. 1997).

[55] Doc. No. 28 (Defendant's Opposition to Plaintiff's Motion to Dismiss Amended Counterclaims) at 3-5.

[56] *Harbison*, 602 F. App'x at 888 (rejecting similar argument concerning 13 Pa. Cons. Stat. § 2302(b) and affirming district court's decision to dismiss unconscionability claim under Pennsylvania law).

In short, Defendant has failed to allege that the agreement is unconscionable, and the disclaimer of warranties thus bars Defendant's affirmative claim for breach of contract.

### B. Defendant States a Claim for Fraud in the Execution

Defendant's counterclaim for fraud in the execution presents a closer question. Plaintiff argues that this claim should be dismissed: (1) for failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b); and (2) because Defendant had the opportunity to review the agreement before signing it, meaning it cannot establish that it was excusably ignorant of the contents of that agreement or that it justifiably relied on Plaintiff's failure to disclose its edits to the agreement. While the Court easily concludes that Defendant's allegations satisfy Rule 9(b), the issue of whether Defendant's admitted failure to review the agreement before signing it precludes a claim for fraud in the execution warrants a more detailed discussion.

Defendant's allegations satisfy Rule 9(b)'s general requirement that "a party must state with particularity the circumstances constituting fraud or mistake"—"that is, the 'who, what, when, where and how' of the events at issue."[57] Here, Defendant identifies the specifics of Plaintiff's alleged fraud (the clandestine substitution of one version of the agreement for a different one in a protective document sleeve); the individual who perpetrated it (Mr. Witt); and the date and location of its occurrence (February 18, 2015, at Defendant's business). Nothing more is required.[58]

The more difficult question is whether Defendant's failure to review the agreement before signing it for the second time on February 18, 2015, is fatal to its counterclaim. "Pennsylvania law recognizes two types of fraud claims that can be brought, as here, in relation

---

[57] *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 267 (3d Cir. 2006) (quoting *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)).

[58] *E.g.*, *Batoff v. Charbonneau*, 130 F. Supp. 3d 957, 971(E.D. Pa. 2015) (concluding that fraud in the execution claim satisfied Rule 9(b) where plaintiff alleged that defendant omitted material terms from a settlement agreement).

10

to a contract: fraud in the inducement and fraud in the execution. Fraud in the inducement is found where 'an opposing party made false representations that induced the complaining party to agree to the contract,' while fraud in the execution exists when 'a term was fraudulently omitted from the contract.'"[59] Specifically, fraud in the execution "occurs where a party alleges that he was mistaken as to the terms and the actual contents of the agreement he executed due to the other's fraud," and renders an agreement void *ab initio*.[60] In *Connors v. Fawn Mining Corp.*, the Third Circuit further explained that "to prevail on a defense of fraud in the execution, a party must show 'excusable ignorance of the contents of the writing signed.'"[61] And like other fraud claims, a party alleging fraud in the execution must establish justifiable reliance on the allegedly fraudulent statement or omission.[62] Here, Plaintiff argues that Defendant cannot show either excusable ignorance or justifiable reliance because it failed to read the final agreement.[63]

Defendant argues that it has pleaded excusable ignorance largely based on *Fawn Mining*, and that case thus merits discussion.[64] There, Fawn Mining was the prospective buyer of a soon-to-be shuttered coal mine.[65] As part of the purchase, Fawn Mining assumed the terms of a collective bargaining agreement ("CBA") with a union representing the mine workers.[66] During

---

[59] *Batoff*, 130 F. Supp. 3d at 969 (quoting *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 205 (Pa. 2007)) (internal quotation marks omitted).

[60] *Id.* at 970 (quoting *Toy*, 928 A.2d at 206) (internal quotation marks omitted).

[61] *Connors v. Fawn Mining Corp.*, 30 F.3d 483, 491 (3d Cir. 1994) (quoting *Agathos v. Starlite Motel*, 977 F.2d 1500, 1505-06 (3d Cir. 1992)).

[62] *Toy*, 928 A.2d at 207. In general, to prove common law fraud in Pennsylvania, a plaintiff must show: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Batoff*, 130 F. Supp. 3d at 968 (quoting *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994))

[63] Doc. No. 22 (Plaintiff's Motion to Dismiss) at 12-15; Doc. No. 33 (Plaintiff's Reply in Support of Motion to Dismiss) at 1-2.

[64] *Fawn Mining Corp.*, 30 F.3d at 490 (citation, alteration, and internal quotation marks omitted).

[65] *Id.* at 486.

[66] *Id.* at 486-87.

negotiations, Fawn Mining won a concession that, in assuming the agreement, it would not be forced to contribute to a benefit plan.[67] Because of the time pressure caused by the imminent closing of the coal mine, however, Fawn Mining received and signed only a signature page of the parties' agreement, and the full version of the agreement was never edited to make clear that Fawn Mining was under no obligation to contribute to the benefit plan.[68] The union then sued, alleging that Fawn Mining was required to make such contributions under the plain language of the agreement.[69] On appeal from a grant of summary judgment to plaintiffs, the Third Circuit reversed. Because the union had "surreptitiously substitute[d] a materially different contract document before both sides execute[d] it," leading to a "radically different" agreement from the one Fawn Mining believed it was signing, the Third Circuit found that Fawn Mining was excusably ignorant of the contents of the writing and could maintain a claim for fraud in the execution.[70]

Here, like *Fawn Mining*, the Defendant alleges that the agreement it intended to sign was surreptitiously substituted for a different one and that the substituted agreement was "radically different" from the one it believed it was signing.[71] The primary distinction between *Fawn Mining* and this case is that Defendant here had the opportunity to read the full agreement to confirm that its proposed warranty term had been incorporated before signing it, and Plaintiff thus argues that Defendant has failed to establish excusable ignorance.[72] The Court disagrees.

---

[67] *Id.*

[68] *Id.* at 486-87, 492.

[69] *Id.* at 488.

[70] *Id.* at 492-93.

[71] *Id.*

[72] Doc. No. 33 at 2-3.

12

Under the facts as alleged by Defendant, regardless of whether Defendant had the opportunity to review the agreement before signing it a second time, Defendant had no reason to do so, because Plaintiff never informed Defendant that it had removed the express warranty. According to Defendant, Plaintiff knew that the agreement was a "no go" without this term, and thus Defendant could reasonably have assumed that Plaintiff would have mentioned its omission before asking Defendant to sign the agreement a second time.[73] In other words, Plaintiff's alleged subterfuge in failing to disclose the deletion of the warranty term left Defendant excusably ignorant regarding the contents of the final agreement.[74]

Plaintiff also argues that Defendant's failure to read the agreement means that Defendant has failed to plead that it justifiably relied upon any fraudulent omission, as a cursory review of the document would have revealed the change.[75] However, the Pennsylvania Supreme Court has explained that a party claiming fraud in the execution is under "no duty to investigate" an allegedly fraudulent statement or omission "in order to justifiably rely" on it.[76] This means that a party claiming fraud in the execution is under "no duty to read" a contract allegedly procured by fraud to confirm its contents unless the fraud is known or obvious; otherwise the failure to do

---

[73] Doc. No. 20 ¶¶ 109, 123-28; *see also generally* Restatement (Second) of Torts §551(2)(e) (1977) ("One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated . . . facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.").

[74] Plaintiff makes much of the fact that Defendant has not alleged it was under any "time pressure" to sign the agreement, Doc. No. 22 at 13, but this fact is not dispositive. It is true that in *Fawn Mining*, the Third Circuit noted the "significant time pressure" the parties faced given the imminent closing of the mine. *Fawn Mining*, 30 F.3d at 492. But the Third Circuit went on to reason that where "an employer reviews a document reflecting the agreements reached in collective bargaining and the union surreptitiously substitutes a materially different contract document before both sides execute it, we think it clear that there has been a fraud in the execution of the contract" because "[t]he employer has never manifested an assent to the terms of the alleged contract, and the written document purporting to evidence the agreement has been obtained by fraud"—reasoning that applies regardless of the time pressures faced by the parties. *Id.* at 493. In any event, Defendant here alleges that it had no reason to review the agreement because it was not aware the warranty had been removed, and the lack of time pressure is thus immaterial.

[75] Doc. No. 33 at 1-2.

[76] *Toy*, 928 A.2d at 207-08.

so will not "preclude [the party] from establishing justifiable reliance."[77] Here, Defendant alleges that it did not know the agreement had been altered, that it expected Plaintiff to disclose any last-minute changes to the warranty term, and that Plaintiff's failure to disclose the elimination of that term misled Defendant as to the actual contents of the agreement.[78] Defendant has therefore alleged that it was not aware of the omission of the warranty term and that the omission was not obvious, meaning it was under no duty to read the contract a final time before signing it.[79] Thus, Defendant has stated a claim for fraud in the execution.

This result accords with the case law in this Circuit. For example, in *March Associates Construction, Inc. v. New Jersey Building Laborers Statewide Pension Fund*, the District of New Jersey, applying *Fawn Mining*, held that a plaintiff stated a claim for fraud in the execution based on allegations that the defendant had surreptitiously changed agreed-upon language prior to execution of a final draft.[80] There, as here, the plaintiff had admittedly not reviewed certain key terms before signing the final agreement, but argued that its failure was excusable, as the defendant had given it no reason to believe those terms had been changed prior to execution.[81] The court agreed, finding that plaintiff had adequately alleged the elements of fraud in the

---

[77] *Id.* at 208

[78] Doc. No. 20 ¶¶ 122-26.

[79] *See Toy*, 928 A.2d at 208 (holding that plaintiff was under no duty to read insurance policy allegedly obtained by fraud in the execution); *see also Batoff*, 130 F. Supp. 3d at 971 (finding that plaintiff reasonably relied upon defendant's fraudulent omission where defendant failed to disclose that certain terms were omitted from settlement agreement); *Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308, 326-27 (Pa. Super. Ct. 2015) (finding that plaintiffs' failure to read insurance policy did not bar fraud-in-the-execution claim and affirming trial court's judgment for plaintiffs) (citations omitted).

[80] Civil Action No. 14-815 (JLL), 2014 WL 2611857, at *5 (D.N.J. June 11, 2014). *March Associates*, like *Fawn Mining* and other cases involving disputes over CBAs, appears to have been decided under federal common law principles, rather than Pennsylvania law. To the extent the two differ, it is not relevant to the Court's analysis, as the Court concludes that Defendant states a counterclaim for fraud in the execution under Pennsylvania law as well as the principles laid out in *Fawn Mining* and its progeny.

[81] *Id.* at *2.

execution and that it was excusably ignorant of the contents of the agreement.[82] The same is true here.

The cases cited by Plaintiff—primarily *Red Online Marketing Group, LP v. Revizer, Ltd.*[83] and the Third Circuit's opinion in *Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc.*[84]—are not to the contrary. In *Red Online*, the defendant brought a counterclaim for fraud in the execution after discovering that the agreement it signed contained terms that were contrary to standard industry practice and its discussions with the plaintiff.[85] The court dismissed the counterclaim because the defendant admitted it had *never* read the agreement, despite having a copy for "several days," did not allege that any "surreptitious substitution of documents" had taken place, and could not identify "any term that was omitted from the Agreement."[86] Here, Defendant read the agreement prior to signing it for the first time, but alleges that Plaintiff deleted a material term without informing it, and then presented the agreement for its signature again without mentioning this edit.[87]

Similarly, *McCormick*, which involved a dispute over a CBA, is not on point. In that case, the parties agreed to include eligibility limits on an employee benefit plan in a revision to the CBA, but inadvertently omitted the agreed-upon language from the final draft.[88] The

---

[82] *Id.* at *5.

[83] Civil Action No. 14-1353, 2015 WL 418143 (E.D. Pa. Feb. 2, 2015).

[84] 85 F.3d 1098 (3d Cir. 1996).

[85] *Red Online*, 2015 WL 418143, at *3.

[86] *Id.* at *6.

[87] At least one other court has voided an agreement for fraud in the execution under similar circumstances. *See Globaltech, Inc. v. Glob. Encasement, Inc.*, No. 99 CV 4307 (CLP), 2009 WL 3352751, at *22-23 (E.D.N.Y. Mar. 12, 2009) (finding contract void due to fraud in the execution where plaintiff substituted terms without informing defendant, and rejecting argument that defendant should have re-read agreement before signing it because defendant "had no basis on which to suspect that [plaintiff's president] had fraudulently substituted new pages into the agreement and [plaintiff's president], in not revealing the substitutions, committed fraud by omission").

[88] *McCormick*, 85 F.3d at 1100-01.

15

defendant-employer nonetheless acted as though the eligibility limits existed, leading to a shortfall in contributions under the plain terms of the agreement.[89] Eventually, the welfare fund that would have been the beneficiary of these contributions sued the defendant to recover them.[90] On appeal, the defendant argued that the agreement should be reformed due to mutual mistake or, in the alternative, because it was a victim of fraud in the execution. The Third Circuit disagreed, finding that because the defendant had multiple opportunities to review the agreement, and never did so, it could not complain of fraud.[91] Notably, before the defendant signed the final agreement, the full document was sent to it coupled with instructions to "review it and get back . . . with any additions or corrections."[92] Here, unlike *McCormick*, Defendant alleges that it was never on notice that it needed to "review and get back" to Plaintiff regarding additional edits— instead, Defendant believed the parties had reached a final agreement before it signed the contract for the first time, and was unaware that Plaintiff later changed a material term before presenting it for Defendant's signature a second time. And unlike *McCormick*, Defendant does not allege that the changes to the agreement were the result of a mistake or a scrivener's error; rather, Defendant alleges intentional fraud.

At bottom, Defendant's failure to review the agreement before signing it for a second time may have reflected poor business judgment, but it does not preclude Defendant from pursuing a fraud claim, since Defendant's neglect was allegedly the result of Plaintiff's own failure to disclose that the agreement had been altered.[93] Plaintiff's motion to dismiss

---

[89] *Id.*

[90] *Id.*

[91] *Id.* at 1108.

[92] *Id.*

[93] *Cf. Emery v. Third Nat'l Bank of Pittsburgh*, 171 A. 881, 548 (Pa. 1934) ("The law is not designed to protect the vigilant, or tolerably vigilant, alone, although it rather favors them, but is intended as a protection to even the foolishly credulous . . . .").

Defendant's counterclaim for fraud in the execution is denied, as is Plaintiff's motion to strike, for which Plaintiff argues no separate bases.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's motion will be granted in part and denied in part. An appropriate Order will be entered.